UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BYRON BOUTIN,

                    Petitioner,

v.                                    Case No. 5:17-cv-221-Oc-39PRL

SECRETARY, DEPARTMENT
OF CORRECTIONS, and ATTORNEY
GENERAL, STATE OF FLORIDA,

                    Respondents.

_____

## ORDER

### I. Background

Petitioner, Byron Boutin, through his attorney, challenges his 2013 state court (Citrus County) conviction of second-degree murder. On May 23, 2013, a grand jury returned a two-count Indictment against Petitioner, charging him with first-degree murder (count one) and possession of a firearm by a convicted felon (count two).[1] Doc. 8-2 at 41.[2] On July 15, 2013, the State filed a notice of its intent to seek the death penalty. Id. at 53. On

---

[1] The State Attorney's Office initially charged Petitioner by Information with second-degree murder and possession of a firearm by a convicted felon. See Doc. 8-2 at 3. The State filed a nolle prosequi after a grand jury returned its Indictment, which included a first-degree murder charge. Id. at 29, 35.

[2] Page numbers referenced throughout this order are those assigned by the Court's electronic document numbering system, including exhibits filed by both Petitioner and Respondents. The Court will cite the exhibits by reference to the document number followed by the page number (i.e., Doc. __ at __).

August 1, 2013, Petitioner demanded a speedy trial, expressly waiving his right to conduct depositions. Id. at 56, 64; Doc. 8-3 at 20, 25. The trial court thereafter granted Petitioner's motion for appointment of co-counsel. Doc. 8-3 at 38-40. Proceeding with two attorneys, Petitioner's trial began on August 19, 2013. Doc. 8-12 at 29.

On count one, a jury found Petitioner guilty of a lesser-included offense, second-degree murder. Doc. 8-10 at 15-16, 19-20; Doc. 8-21 at 71.[3] After his trial, Petitioner entered a negotiated plea of no contest on count two, possession of a firearm. Doc. 8-10 at 19-20, 50, 55. On the murder conviction, Petitioner received a life sentence without the possibility for parole. Id. at 28.

In his Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1; Petition), which Petitioner supplements with a memorandum (Doc 2; Memo), Petitioner raises five grounds. In his first four grounds, Petitioner contends his trial counsel was ineffective for (1) failing to file a motion for new trial, (2) failing to have portions of Petitioner's recorded police interview redacted before trial or, to timely object, move for mistrial, or request a curative instruction at trial, (3) failing to object to

---

[3] The trial judge granted Petitioner's motion to sever count two from the jury's consideration at trial. Doc. 8-12 at 42-43.

improper comments the prosecutor made during closing argument, and
(4) failing to object to a <u>Brady</u>[4] violation.[5] <u>See</u> Petition at 4,
6-7, 10, 12. In his fifth ground, Petitioner asserts the cumulative
effect of counsel's deficient performance "produced a
fundamentally flawed trial." <u>Id.</u> at 17.

## II. Evidence at Trial

At trial, the State published to the jury a four-plus-hour-
long recorded interview of Petitioner by detectives. Doc. 8-17 at
96. During this interview, Petitioner told the detectives that he,
his co-defendant, Ms. Crystal Brinson, and the victim, Deanna
Stires, were together at Petitioner's house on December 24, 2012.
<u>Id.</u> at 99, 103. All three had been doing drugs, together and
separately.[6] <u>Id.</u> at 102, 106. Petitioner was in bed most of the
day because he had a cold. While he was in bed, Ms. Brinson and
the victim were "playing on the computer and smoking dope." <u>Id.</u> at
105-06. The girls also arranged a drug deal with a man from Temple
Terrace. <u>Id.</u> at 106. The man came to Petitioner's house to exchange

---

[4] <u>Brady v. Maryland</u>, 373 U.S. 83, 86 (1963) (holding that the
State's suppression of potentially exculpatory evidence is a
violation of the Due Process Clause of the Fourteenth Amendment).

[5] Petitioner asserts these claims against "counsel" generally,
without distinguishing between his two trial attorneys. Thus, the
Court references Petitioner's trial attorneys together as
"counsel" throughout this order.

[6] According to a trial witness, the victim had been doing
crystal methamphetamine (meth) for days before her death. Doc. 8-
15 at 114, 117.

"some dope for some [morphine] pills." Id. at 107, 108. Petitioner told the detectives he gave Ms. Brinson the drugs Ms. Brinson traded for morphine pills, though Petitioner did not meet the man or participate in the drug deal. Id. at 107.

Shortly after the drug deal, Petitioner and Ms. Brinson left the house for about one hour to run an errand. Id. at 108-09. During that time, the victim "up-ended" Petitioner's house and stole some of his drugs (located both in a bag and a "bowl"). Id. at 109, 111. According to Petitioner, he confronted the victim about his missing drugs, but she could not be "talked to" and kept saying Petitioner had stolen all the clothes in his house from someone named Rusty. Id. at 110-11. When Petitioner's friend "Momma"[7] came to the house, Petitioner tried to find his bowl so they could smoke meth together. Id. at 111. Petitioner then realized that his bowl was missing, and he told Momma he believed the victim had taken it.[8] Id. Momma helped Petitioner search for the missing bowl, and she questioned the victim. Id. at 111-12.

---

[7] The nickname "Momma" or "Momma C.J." refers to Connie Waller. Doc. 8-15 at 111. According to Petitioner, Ms. Waller got her nickname because "[s]he's everybody's Momma." Doc. 8-19 at 53.

[8] Petitioner explained to the detectives that he met the victim at Momma's house. Thus, he thought Momma was responsible for bringing them together. Doc. 8-18 at 28. Petitioner said, "I hold Momma responsible because I met [the victim] at Momma's house. You know, if I met somebody at your house, it's kind of you vouching for them." Id. Petitioner later said, "Momma C.J. was going to get a[n] . . . earful . . . over introducing me to that girl." Id. at 49.

Petitioner said Momma could not "get through" to the victim, who was crying and continued saying Petitioner stole another man's clothes. Id.

Petitioner eventually found his missing bag of drugs in the victim's wallet, but he could not find his bowl.[9] Id. at 113, 116. When Momma was ready to leave, Petitioner asked Momma to take the victim with her because he wanted the victim out of his house. Id. at 114. Momma did not take the victim, but Momma took the victim's belongings on the understanding that Petitioner planned to bring the victim to Momma's house later. Id.; Doc. 8-19 at 40-41. After Momma left, Petitioner spent about two to three hours searching for his missing bowl. Doc. 8-17 at 115. He told the detectives he was unsure what Ms. Brinson and the victim were doing during that time, but he thought they were talking in the kitchen or the bedroom. Id. at 117, 119. Petitioner later acknowledged, however, that Ms. Brinson had been interrogating the victim to find out where the victim hid Petitioner's bowl. Doc. 8-18 at 62-63.

In the early morning hours of December 25, 2012, after Petitioner ceased his search for the missing bowl, Petitioner told Ms. Brinson and the victim that he was going to take the victim

---

[9] Petitioner ended up finding the bowl about five days later. Doc. 8-17 at 116.

back to Momma's house.[10] Doc. 8-17 at 117, 121, 127. The victim willingly walked to the door with Petitioner and Ms. Brinson, but then she started "to freak out" and did not want to leave the house. Id. at 122. Using Petitioner's gun, and in Petitioner's presence, Ms. Brinson struck the victim in the head multiple times. Id.; Doc. 8-18 at 23-24. Petitioner said Ms. Brinson hit the victim because the victim "got all wacky, and didn't want to leave." Doc. 8-17 at 128.

After Ms. Brinson hit the victim, the victim became unconscious and was snoring. But Petitioner ascribed Petitioner's condition to having taken morphine and meth, not to having been beaten with a gun. Id. at 132-33, 134-35; Doc. 8-18 at 31. According to Petitioner, Ms. Brinson had earlier given the victim some of the morphine pills the man from Temple Terrace exchanged for Petitioner's drugs. Doc. 8-17 at 125-26. Eventually, however, Petitioner admitted that a few minutes before Petitioner told the victim and Ms. Brinson they were leaving for Momma's house, and before Ms. Brinson struck the victim in the head, Ms. Brinson used a needle to inject the victim with morphine. Doc. 8-18 at 38, 43.

Petitioner, at first, denied witnessing Ms. Brinson administer the morphine injection. Id. at 42. After some prompting

---

[10] The victim may have been staying with Momma before her death. Petitioner said he wanted to take the victim "home" when referencing Momma's house. See Doc. 8-18 at 118-19.

by the detectives, however, Petitioner conceded he watched Ms. Brinson administer the injection, but he thought it was consensual. Id. at 64-65, 74-75. Petitioner said he thought the victim and Ms. Brinson had agreed to "get high" one more time before the victim went back to Momma's house. Id. at 74-75.

Once the victim became unconscious, Petitioner and Ms. Brinson moved the victim to the back seat of his car, and Petitioner drove to his father's vacant home instead of bringing the victim to Momma's house as planned. Doc. 8-17 at 136-37. Petitioner and Ms. Brinson carried the victim to the garage, placed her on a table, taped her hands behind her back, gagged her, put a blanket partially over her, turned on the radio, and left. Id. at 138; Doc. 8-18 at 127. When Petitioner and Ms. Brinson returned with Momma about fifty to sixty minutes later, the victim was dead. Doc. 8-17 at 139.

At Momma's direction, Petitioner and Ms. Brinson wrapped the victim's body in some black material that Petitioner found in the garage. Id. at 149-50; Doc. 8-18 at 153-54, 161. They secured the material with wire and strap ties. Doc. 8-17 at 150; Doc. 8-18 at 20. Petitioner and Ms. Brinson moved the victim's body to the trunk of Petitioner's car where the body remained for two days until Petitioner identified a location to dispose of it, which he did by himself. Doc. 8-17 at 151, 160; Doc. 8-18 at 1, 3, 4, 16; Doc. 8-

19 at 24. On January 18, 2013, a local hunter found the body and called the police. Doc. 8-14 at 73.

A medical examiner testified that the cause of the victim's death was acute morphine intoxication, and the manner of death was homicide. Doc. 8-15 at 24, 27. The medical examiner explained the victim died before she could metabolize the amount of morphine she had in her body, which was "magnitudes of order higher than . . . would ever [be] see[n] in somebody who was a terminal cancer patient receiving a morphine drip." Id. at 20. While the victim had a "very, very high" amount of morphine in her system, the medical examiner could not determine the method by which the drug was delivered (pill form, injection, or other). Id. at 46-47. In addition to the high level of morphine, the victim had other intoxicants or drugs in her system: alcohol, ibuprofen, and a drug found in common cold medicines. Id. at 34, 36, 38.[11]

Petitioner told the detectives he did not know how much morphine Ms. Brinson gave the victim. Doc. 8-18 at 71. But he recognized the victim showed signs of overdose "[f]rom just the way [the victim] was fu\*\*ing sweating . . . it was just like rolling off." Id. Petitioner never considered taking the victim to the hospital or calling emergency medical services, id., but he

---

[11] Despite testimony that the victim had been doing meth for days before her death, the autopsy and toxicology results did not show meth was a contributing factor in the victim's death. Doc. 8-15 at 24-25.

said he did not think such action was necessary because he thought the victim would be fine. Id. at 98-99. Petitioner said the victim did not object to the morphine injection, and Petitioner did not think Ms. Brinson had given the victim too much morphine even though the victim was "sweating bad."[12] Id. at 99, 126, 146; Doc. 8-19 at 8, 77.

### III. Timeliness & Exhaustion

Respondents concede Petitioner timely filed his Petition and exhausted all grounds for relief. See Resp. at 4, 5. Thus, the Court accepts as undisputed that the claims are timely and exhausted.

### IV. Evidentiary Hearing

Petitioner requests an evidentiary hearing. See Reply at 2. Petitioner has the burden to establish an evidentiary hearing is necessary. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011) (opining a petitioner bears the burden of establishing the need for an evidentiary hearing with more than speculative claims of need). Petitioner asserts the record demonstrates there are "debatable issues of material fact," though he does not explain his conclusion. See Reply at 2. In particular, Petitioner "has not identified, much less proffered, any additional evidence" he would present in support of his grounds

---

[12] The victim was sweating despite it being a chilly December day. Doc. 8-18 at 102.

for relief. See Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Upon review, the Court can "adequately assess [Petitioner's] claim[s] without further factual development." Id. Accordingly, Petitioner is not entitled to an evidentiary hearing. See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

## V. Applicable Standards

### A. Habeas Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs a state prisoner's federal petition for habeas corpus and "prescribes a deferential framework for evaluating issues previously decided in state court," Sealey v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1354 (11th Cir. 2020), limiting a federal court's authority to award habeas relief. See 28 U.S.C. § 2254; see also Shoop v. Hill, 139 S. Ct. 504, 506 (2019) (per curiam) (recognizing AEDPA imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases").

When a state court has adjudicated a petitioner's claim on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d). <u>See also</u> <u>Nance v. Warden, Ga. Diagnostic Prison</u>, 922 F.3d 1298, 1300-01 (11th Cir. 2019), <u>cert. denied</u>, No. 19-6918, 2020 WL 1325907 (U.S. Mar. 23, 2020). The burden of proof is high; "clear error will not suffice." <u>Virginia v. LeBlanc</u>, 137 S. Ct. 1726, 1728 (2017).

A federal district court must give appropriate deference to a state court decision on the merits. <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). The state court need not issue an opinion explaining its rationale for its decision to qualify as an adjudication on the merits. <u>Id.</u> Where the state court's adjudication is unaccompanied by an explanation, the district court should presume the unexplained decision adopted the reasoning of the lower court:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

<u>Id.</u>

To obtain habeas relief, the state court decision must unquestionably conflict with Supreme Court precedent, not dicta. <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011). If some fair-minded jurists could agree with the state court's decision, habeas relief must be denied. <u>Meders v. Warden, Ga. Diagnostic Prison</u>, 911 F.3d 1335, 1351 (11th Cir. 2019), <u>cert. denied</u>, 140 S. Ct. 394

(2019). Therefore, unless the petitioner shows the state court's ruling was so lacking in justification that there was error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement, there is no entitlement to habeas relief. Burt v. Titlow, 571 U.S. 12, 19-20 (2013). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The AEDPA standard is intended to be difficult for a petitioner to meet. Harrington, 562 U.S. at 102. A district court's obligation is to "train its attention" on the legal and factual basis for the state court's ruling, not to "flyspeck the state court order or grade it." Meders, 911 F.3d at 1349 (citing Wilson, 138 S. Ct. at 1191-92).

### B. Ineffective Assistance of Counsel

To demonstrate trial counsel was ineffective, a habeas petitioner must satisfy a rigorous two-prong test by showing (1) counsel's performance was deficient, meaning it fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984). Restated, a criminal defendant's Sixth Amendment right to effective assistance of counsel "is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough

v. Gentry, 540 U.S. 1, 5 (2003) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland, 466 U.S. at 687).

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)).

The performance prong is highly deferential, requiring a "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689). Thus, "to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001). (emphasis in original). The prejudice prong requires a showing that there is a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. Strickland, 466 U.S. at 695.

When the "strong presumption" standard of Strickland is applied "in tandem" with the highly deferential AEDPA standard, a

13

review of the state court's determination as to the "performance" prong is afforded double deference. Richter, 562 U.S. at 105. Accordingly, the question for a federal court is not whether trial counsel's performance was reasonable, but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," a federal court may not disturb a state-court decision denying the claim. Id. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Analysis

### A. Ground One

In his first ground, Petitioner asserts his counsel was ineffective for failing to file a motion for new trial. Petition at 4-5. Petitioner contends counsel's failure was not harmless because it "caused the weight of the evidence standard not to be applied." Id. at 5. Had trial counsel moved for a new trial, according to Petitioner, "there is a reasonable likelihood" that such a motion would have been granted. Memo at 15.

Petitioner raised this claim as ground one in his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 (Rule 3.850 Motion). See Doc. 1-1 at 31. In his Rule 3.850 Motion, Petitioner argued he was convicted of a crime for which he was legally innocent because the greater weight of the evidence

14

was exculpatory. Id. at 33. In his Petition, Petitioner suggests the testimony of two of the State's witnesses were somewhat favorable to him, though he does not explain how the weight of the evidence was exculpatory.[13] Petition at 5.

The postconviction court denied Petitioner's claim. Doc. 1-1 at 8. Florida's Fifth District Court of Appeal (Fifth DCA) affirmed without opinion and issued its mandate. Doc. 8-31 at 55, 56. To the extent the Fifth DCA affirmed the postconviction court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. See Wilson, 138 S. Ct. at 1194. As such, the Court will "look through" the unexplained opinion to the postconviction court's order on Petitioner's Rule 3.850 Motion. Id.[14]

In denying Petitioner's claim, the postconviction court found significant that Petitioner was charged with first-degree murder but was sentenced to the lesser-included offense of second-degree murder based on the following evidence: Petitioner witnessed Ms. Brinson inject the victim with morphine that resulted in her death;

---

[13] For instance, Petitioner says one witness confirmed that Ms. Brinson was the primary actor, and another witness "circumstantially implied" it was not Petitioner's drugs that Ms. Brinson used to exchange for the morphine pills. Petition at 5.

[14] In looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

Petitioner may have struck the victim;[15] Petitioner assisted Ms. Brinson "in tying the victim to a chair, covering her while she was alive[,] in effect letting her die"; and Petitioner disposed of the body. See Doc. 1-1 at 8-9. Additionally, the court noted, Petitioner's ex-wife testified that Petitioner told her he had "done something bad" to someone. Id. at 9. The court also recounted the physical evidence connecting Petitioner to the victim's death: the victim's blood was found inside both his home and his car. Id. The postconviction court concluded:

> There was overwhelming evidence that a [sic] [Petitioner] was involved in "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" See § 782.04(2), Fla. Stat. (2013). Therefore, [Petitioner's] trial attorneys did not have a basis to file a Motion for a New Trial and his first claim is without merit.

Id. Based on the "overwhelming evidence" of guilt, the postconviction court found Petitioner's trial counsel "did not have a basis" upon which to move for a new trial. Id.

Petitioner is unable to establish the state court's adjudication of the claim was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or was based on an unreasonable

---

[15] There is no evidence that Petitioner himself hit the victim.

determination of the facts. In its order denying Petitioner's Rule 3.850 Motion, the postconviction court set forth the applicable two-prong <u>Strickland</u> test and recognized that an attorney's strategic choices are "virtually unchallengeable." <u>Id.</u> at 7-8. The record demonstrates the postconviction court properly applied the <u>Strickland</u> standard.

Even if the state court's adjudication is not entitled to deference, however, and assuming Petitioner can satisfy the first <u>Strickland</u> prong, Petitioner is unable to demonstrate any alleged deficient performance by his trial counsel was prejudicial to his defense. The judge who ruled on Petitioner's Rule 3.850 Motion is the same judge who presided over his trial. In ruling on the Rule 3.850 Motion, the postconviction court noted the evidence against Petitioner was "overwhelming." <u>Id.</u> at 9. As such, the judge likely would have denied a motion for new trial.

Petitioner takes issue with the portions of the record the postconviction court referenced in its order, asserting "the transcript does not mention Petitioner tying the victim to a chair," and "there was no evidence that [Petitioner] knew the victim was dying." Reply at 8. While Petitioner did not <u>tie</u> the victim to a <u>chair</u>, Petitioner himself described in detail how he and Ms. Brinson restrained the victim on an inversion table where they left her despite her showing signs of possible overdose. Doc. 8-18 at 127-28. The postconviction court's imprecise nomenclature

aside (i.e., "chair" versus "table" and "tie" versus "tape"), the evidence supports the jury's verdict.

The jury found Petitioner guilty of second-degree murder, which is defined under Florida law as "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Fla. Stat. § 782.04(2). The trial judge instructed the jury as follows:

> An act is [im]minently dangerous to another demonstrating a depraved mind if it is an act or series of acts that:
>
> (1)  A person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
>
> (2)  Is done from ill will, hatred, spite, or an evil intent, and
>
> (3)  Is of such a nature that the act itself indicates an indifference to human life.

Doc. 8-20 at 77.

Petitioner contends in his Reply that Ms. Brinson was the one who "overdosed the victim with morphine causing her death without Petitioner's knowledge or participation." Reply at 9. However, Petitioner told the detectives that he witnessed the injection. Doc. 8-18 at 65. The jurors also heard the following from Petitioner: the victim "up-ended" his home and attempted to steal his drugs, Doc. 8-17 at 109-110; after Ms. Brinson interrogated

the victim and injected her with morphine, Petitioner watched Ms. Brinson beat the victim in the head using Petitioner's gun, id. at 122; Petitioner transported the victim in his own car to his father's garage, id. at 132-33, a decision he told the detectives he himself made, Doc. 8-19 at 3; inside the garage, Petitioner and Ms. Brinson restrained the victim while she was still alive, Doc. 8-18 at 127-28; Petitioner understood that sweating was a sign of overdose, and the victim was sweating when he left her in the garage, despite it being a chilly day, id. at 70-71; and Petitioner did not consider calling emergency services or taking the victim to the hospital, either before leaving her in the garage or after he and Ms. Brinson found her dead, id. at 71, 154.

These facts alone, relayed through Petitioner's own voice, support the finding that Petitioner's actions were "imminently dangerous" and "evince[ed] a depraved mind regardless of human life." See Fla. Stat. § 782.04(2). Indeed, Petitioner told the detectives that upon reflection, his actions sounded "vicious," "shitty," and "evil." Doc. 8-18 at 138, 148, 161; Doc. 8-19 at 1, 5. Additionally, regardless of how the morphine was obtained, or whether Petitioner actively participated in injecting the victim with morphine and hitting her, under a principal theory, Petitioner

was "treated as if he had done all of the things" Ms. Brinson did.
See Doc. 8-20 at 85.[16]

Aside from Petitioner's recorded interview, other evidence
suggested Petitioner's guilt: Petitioner's ex-wife testified that
Petitioner called her after the victim's death, and Petitioner
confessed that he had done something bad to someone else. Doc. 8-
14 at 59. Petitioner asked his ex-wife if he could stay with her
for a while, suggesting he had plans to flee. Id. at 63.
Additionally, consistent with Petitioner's description of events,
the victim's DNA matched that found on Petitioner's gun, in his
home, and in his car. Doc. 8-16 at 44-45, 47, 56, 149.

---

[16] The trial judge instructed the jury on the definition of a
"principal" to a crime, as follows:

> If the Defendant helped another person or
> persons commit or attempt to commit a crime,
> the Defendant is a principal and must be
> treated as if he had done all of the things
> the other person or persons did if:
>
> (1)   The Defendant had a conscious intent that
>       the criminal act be done, and
>
> (2)   The Defendant did some act or said some
>       word which was intended to and which did
>       insight [sic], cause, encourage, assist,
>       or advise the other person or persons to
>       actually commit or attempt to commit the
>       crime.

Doc. 8-20 at 85.

Moreover, the jurors reasonably could have doubted Petitioner's attempt to paint himself as an innocent bystander who was unintentionally caught up in someone else's "deal." Petitioner lied to detectives on at least two occasions before he ultimately confessed. And when he did confess, Petitioner omitted crucial facts until the detectives prodded him for the truth. For instance, Petitioner initially failed to disclose that he watched Ms. Brinson inject the victim with morphine and that Ms. Brinson used his gun to strike the victim in the head.

At first, Petitioner denied any knowledge of what Ms. Brinson and the victim had been doing during the two to three hours he was searching for his bowl or why Ms. Brinson had his gun. Doc. 8-17 at 121. However, Petitioner said he searched every room in the house, including the kitchen, where he says Ms. Brinson and the victim were talking, and he later conceded Ms. Brinson was interrogating the victim, during which time Ms. Brinson must have had his gun. Id.; Doc. 8-18 at 51, 62-63, 93, 96.

Petitioner also initially led the detectives to believe the victim had taken some of the morphine pills the man from Temple Terrace gave Ms. Brinson in exchange for Petitioner's drugs. Doc. 8-17 at 125-26. Later, though, he admitted he did not know whether the victim had taken any of the pills but conceded he saw Ms. Brinson inject the victim with morphine using a needle. Doc. 8-18 at 38, 43, 75. Petitioner suggested Ms. Brinson injected the victim

to calm the victim down, but Petitioner acknowledged he heard no commotion when he was searching for his bowl, and Ms. Brinson and the victim had been "getting along great." Id. at 42, 43, 58, 61, 103. Thus, there appeared no need for the victim to calm down at the time Petitioner said Ms. Brinson administered the injection. Id. at 103. According to Petitioner, the victim only started "freaking out" and yelling minutes after Ms. Brinson injected her with morphine. Id. at 59, 99, 101, 105. Petitioner's best guess why the victim suddenly "freaked out" after having been calm for hours was that the victim must have "thought she was getting taken to get killed." Id. at 103-04.

Petitioner's explanations for some of his own actions on the day of the victim's death also were somewhat unconvincing and, at times, contradictory. For instance, Petitioner said he was the one to duct tape the victim's hands behind her back "so that she wouldn't freak out" if she regained consciousness. Id. at 127-28, 131. Logically, relocating, physically restraining, and gagging a person who was recently attacked and high on drugs would elicit just the reaction Petitioner claims he was trying to avoid: it would cause that person to "freak out." And Petitioner could not convincingly reconcile his decision to tape the victim's hands behind her back with his expressed concern for her falling off the table. Id. at 137-38. When the detective asked Petitioner why he taped the victim's hands if he was afraid of her falling, he said,

"Then she could, like, wake up and focus on where she is before she started flipping out, because on the way to the door [at Petitioner's house], she just flipped out . . . [with] no concern for even where walls are or anything." Id.

Petitioner's explanation for bringing the victim to his dad's vacant house instead of to Momma's house, as planned, invited skepticism as well. Petitioner initially said he did not know who would be at Momma's house, and he wanted to avoid the "drama" of Momma's house, Doc. 8-17 at 137, but later he said, he "didn't want to drive any farther than [he] had to . . . with [the victim] passed out," Doc. 8-19 at 3-4. Petitioner himself acknowledged his decision did not make sense in retrospect. He told the detectives, "[It makes] [n]o sense, now that you think of it, why I didn't want to drive with her like that, but I'm being honest with you." Id. at 5.

Finally, aside from Petitioner's admission to his role in events leading up to the victim's death, he explained the steps he took to dispose of the victim's body and other evidence. After the victim died, Petitioner removed the tape and rag he and Ms. Brinson used to restrain the victim, and he burned them; Petitioner cleaned the blood inside his house; Petitioner asked others how to dispose of a dead body; and, he alone disposed of the victim's body two days after she died. Doc. 8-18 at 139-40.

23

Upon review, Petitioner fails to demonstrate his counsel's alleged failure to move for a new trial prejudiced his defense. Because Petitioner fails to overcome AEDPA's deferential standard and fails to show any alleged deficient performance by his trial counsel prejudiced his defense, Petitioner is not entitled to habeas relief on ground one.

### B. Ground Two

In ground two, Petitioner asserts his counsel was ineffective for failing to redact portions of his recorded interview, or to timely object, move for a mistrial, or request a curative instruction. Petition at 6-7. See also Memo at 16-18. Petitioner contends two statements he made to the detectives should have been redacted before being published to the jury: (1) his reference to having been in jail shortly before the victim's death; and (2) his admission to having been a drug dealer in the past and having been arrested for possession with intent. Petition at 6-7. As to the latter statement, the jury heard Petitioner say, "I should have been caught for much worse" because "I was moving a couple hundred pounds [of weed] a week." Id. at 7-8.

Petitioner argues the unredacted prejudicial statements were compounded during closing argument when the prosecutor attacked Petitioner's character by portraying him as a drug dealer. Id. at 8. In closing, the prosecutor told the jury Petitioner was involved in a "joint venture" with Ms. Brinson to exchange Petitioner's

meth for morphine; Petitioner was a "drug dealer"; and Petitioner knows about drugs, drug injection and ingestion, and overdoses. Id.

Petitioner raised this claim as ground two in his Rule 3.850 Motion. See Doc. 1-1 at 34. The postconviction court denied Petitioner's claim. Id. at 9. The Fifth DCA affirmed without opinion. Doc. 8-31 at 55. To the extent the Fifth DCA affirmed the postconviction court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. See Wilson, 138 S. Ct. at 1194. As such, the Court will "look through" the unexplained opinion to the postconviction court's order on Petitioner's Rule 3.850 Motion. Id.

The postconviction court found Petitioner's claim without merit and "conclusively refuted by the record." Doc. 1-1 at 9. The court explained, "At trial, defense counsel sought redaction of certain portions of his statement. The State acknowledged that not all portions were redacted due to time constraints. Trial counsel sought a mistrial[;] however[,] the Court denied his motion." Id. (citations omitted).

Petitioner is unable to establish the state court's adjudication of the claim was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or was based on an unreasonable

determination of the facts. In its order denying Petitioner's Rule 3.850 Motion, the postconviction court set forth the applicable two-prong Strickland test. Id. at 7-8. The record demonstrates the postconviction court properly applied the Strickland standard in concluding counsel's performance was not deficient.

Even if the state court's adjudication is not entitled to deference, however, and assuming Petitioner can satisfy the first Strickland prong, for the reasons previously discussed, Petitioner is unable to demonstrate any alleged deficient performance by his trial counsel was prejudicial to his defense. Without these statements, the evidence supports a second-degree murder conviction.

Moreover, the jury must not have been persuaded that Petitioner was engaged in a "joint venture" with Ms. Brinson to distribute drugs on the day the victim died. In closing, the prosecutor argued the evidence supported a first-degree murder conviction under two theories, including felony murder. Doc. 8-20 at 20-21. As the prosecutor explained to the jury, under a felony murder theory, the State must demonstrate the victim died during the commission of a felony, such as the distribution of a controlled substance. Id. The jury declined to convict Petitioner of first-degree murder under a felony murder theory.[17] Because

---

[17] It is clear the jury considered the felony murder theory because the jurors submitted the following question to the trial

Petitioner was convicted of second-degree murder, not felony murder, he fails to demonstrate that "every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" See Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694).

Because Petitioner fails to overcome AEDPA's deferential standard and fails to show any alleged deficient performance by his trial counsel prejudiced his defense, Petitioner is not entitled to relief on ground two.

### C. Ground Three

In ground three, Petitioner asserts his trial counsel was ineffective for failing to object to improper statements the prosecutor made in closing argument. Petition at 10; Memo at 18. Petitioner contends the prosecutor improperly interjected his personal opinion when he suggested Petitioner's explanation for some of his actions were unbelievable. First, the prosecutor questioned Petitioner's explanation as to why he taped the victim's hands when he put her in the garage, and said to the jury, "Folks, [you] want to believe that, you walk that Defendant right out the

---

judge while they were deliberating: "[Can you give us a] definition for distribution?" Doc. 8-20 at 109. After consultation with the State and defense counsel, the trial judge provided the following definition to the jurors: "Distribute means to deliver other than by administering or dispensing a controlled substance." Id. at 118.

. . . courtroom door. That flies in the face of common sense and it flies in the face of the other evidence in this case." Petition at 10. See also Doc. 8-20 at 8.

Second, the prosecutor suggested Petitioner was being untruthful when he told detectives he did not know Ms. Brinson had taken his gun out of the safe. The prosecutor told the jury, "His gun's stored in his safe, yet, Oh, I don't know how—I don't know nothing about how she got it. You want to believe that, I can't stop you from believing that." Petition at 10; Doc. 8-20 at 15. Third, the prosecutor told jurors that Petitioner "was no more being fully honest with law enforcement than there's a man in the moon." Petition at 10; Doc. 8-20 at 68. Petitioner also takes issue with the prosecutor's statement during closing that Petitioner was "a drug dealer [who] prays [sic] on people." Petition at 10; Doc. 8-20 at 13.

Petitioner raised this claim as ground three in his Rule 3.850 Motion. See Doc. 1-1 at 39. The postconviction court denied Petitioner's claim. Id. at 10. The Fifth DCA affirmed without opinion. Doc. 8-31 at 55. To the extent the Fifth DCA affirmed the postconviction court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. See Wilson, 138 S. Ct. at 1194. As such, the Court will "look through" the unexplained

opinion to the postconviction court's order on Petitioner's Rule 3.850 Motion. Id.

The postconviction court denied Petitioner's claim, concluding "the comments made by the State do not constitute reversible error and [are] not improper[;] thus[,] an objection was not warranted." Doc. 1-1 at 10. The court continued:

> The State comments asked the jury to use their common sense and highlighted the evidence that was presented at trial. Trial counsel did object at one point regarding the reference to the [Petitioner] being a drug dealer. However, the Court overruled the objection. The State's statements do not rise to the level of personalizing of the prosecutor or appeals to the jurors' emotions.

Id. (citations omitted).

Petitioner is unable to establish the state court's adjudication of the claim was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. In its order denying Petitioner's Rule 3.850 Motion, the postconviction court set forth the applicable two-prong Strickland test. Id. at 7-8. The record demonstrates the postconviction court properly applied the Strickland standard in concluding counsel's performance was not deficient.

Even if the state court's adjudication is not entitled to deference, however, and assuming Petitioner can satisfy the first Strickland prong, Petitioner is unable to demonstrate any alleged

deficient performance by his trial counsel was prejudicial to his defense. The prosecutor's suggestion to the jury that Petitioner was a drug dealer or that some of his statements to the detectives were not trustworthy were made to demonstrate the evidence supported a first-degree murder conviction. Doc. 8-20 at 21. The prosecutor attempted to demonstrate the victim's death was premeditated or was the result of "unlawful distribution of a controlled substance." Id. at 21, 23.

Given the jury did not find Petitioner guilty of first-degree murder, the prosecutor's statements cannot be said to have prejudiced Petitioner's defense. Furthermore, the trial judge instructed the jurors that they must "decide what evidence is reliable" and to "use [their] common sense in deciding which is the best evidence and which evidence should not be relied upon." Doc. 8-20 at 87. "A jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). Finally, as summarized above, Petitioner's recorded interview by the detectives was fraught with contradiction and invited skepticism.[18]

Accordingly, because Petitioner fails to overcome AEDPA's deferential standard and fails to show any alleged deficient

---

[18] This assessment is based on the cold transcript. The jurors viewed a video, so they had an opportunity to observe Petitioner's mannerisms and non-verbal communications.

performance by his trial counsel prejudiced his defense, Petitioner is not entitled to relief on ground three.

### D. Ground Four

In ground four, Petitioner asserts his counsel was ineffective for failing to object to a <u>Brady</u> violation. Petition at 12; Memo at 19. One of the State's witnesses, Kevin Shields, gave two recorded statements to the police, but, Petitioner contends, the State disclosed to the defense only the second. Petition at 12. Petitioner contends the first recorded interview could have been used to impeach Mr. Shields at trial. <u>Id.</u>

Petitioner raised this claim in ground four of his Rule 3.850 Motion. Doc. 1-1 at 42. The postconviction court denied Petitioner's claim. <u>Id.</u> at 11-12. The Fifth DCA affirmed without opinion. Doc. 8-31 at 55. To the extent the Fifth DCA affirmed the postconviction court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. <u>See</u> <u>Wilson</u>, 138 S. Ct. at 1194. As such, the Court will "look through" the unexplained opinion to the postconviction court's order on Petitioner's Rule 3.850 Motion. <u>Id.</u>

The postconviction court found Petitioner failed to demonstrate a <u>Brady</u> violation because, even though the State did not disclose Mr. Shields's first recorded interview, "the State disclosed recorded interviews of Mr. Shields on July 29, 2013,"

31

and, on August 5, 2013, disclosed "reports prepared by law enforcement regarding [both of] Mr. Shields'[s] statements."[19] Doc. 1-1 at 11-12. Petitioner concedes that before his trial commenced, the State disclosed reports summarizing Mr. Shields's two recorded interviews. Reply at 15. However, he maintains, he never received a recording of the first interview. Id. Despite having received a summary of the first interview, Petitioner asserts, "any paraphrased synopsis in a police report of what Mr. Shields may have said does not replace the actual recorded interview." Id.

In its order denying Petitioner's Rule 3.850 Motion, the postconviction court set forth the applicable test under Brady, Doc. 1-1 at 11, which holds "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). The postconviction court also set forth the applicable test for "materiality" under the Brady standard, Doc. 1-1 at 11: evidence is material if there is a "reasonable probability that . . . the result of the trial would have been different" had it been disclosed. United States v. Bagley, 473 U.S. 667, 684 (1985).

---

[19] Trial began on August 19, 2013, shortly after Petitioner's demand for a speedy trial. See Doc. 8-12 at 29, 36-37.

Petitioner fails to show the postconviction court's adjudication of this claim was contrary to clearly established law, including <u>Brady</u>, <u>Bagley</u>, and <u>Strickland</u>, involved an unreasonable application of clearly established law, or was based on an unreasonable determination of the facts. The postconviction court's determination that Petitioner failed to demonstrate prejudice because Petitioner "had other means of obtaining the information" is not objectively unreasonable. <u>See</u> Doc. 1-1 at 12.

Nevertheless, even if the state court ruling is not entitled to deference, Petitioner's claim has no merit. To establish a <u>Brady</u> violation, a petitioner must demonstrate: (1) the government possessed evidence favorable to the defendant; "'(2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.'" <u>Riechmann v. Fla. Dep't of Corr.</u>, 940 F.3d 559, 580 (11th Cir. 2019) (quoting <u>United States v. Stein</u>, 846 F.3d 1135, 1145-46 (11th Cir. 2017)).

As to the fourth element, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Strickler v. Greene</u>, 527 U.S. 263, 289-90 (1999)

(quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). It is not enough for a petitioner to show the disclosed evidence possibly could have resulted in a different outcome at trial. Id. at 291.

Upon review, trial counsel's decision not to assert a Brady violation was reasonable because such an objection likely would have been meritless. Because the State disclosed a summary of the first interview, the defense, with reasonable diligence, could have obtained the evidence. See Riechmann, 940 F.3d at 580. Additionally, had Petitioner's counsel chosen to use Mr. Shields's first interview to effectively impeach him at trial, the elements of second-degree murder still would have been proven through Petitioner's recorded police interview and other evidence. Thus, there is not a reasonable probability that the outcome would have been different.

Significantly, Mr. Shields did not see any of the events leading up to the victim's death; he only testified to having been doing meth with the victim the day before her death and having seen Petitioner and Ms. Brinson after the victim died. Doc. 8-15 at 114, 124. Petitioner himself told the trial court, during a pretrial hearing, that he and his co-defendant are the only two who know what happened. Doc. 8-3 at 22. The court reporter who transcribed the hearing testified at trial, relaying what Petitioner had said: "I honestly don't believe that [depositions

are] important because no one was there except me and my codefendant." Doc. 8-14 at 50.

Moreover, in contradiction to his argument in this ground for relief, Petitioner asserts in ground one that Mr. Shields's testimony was favorable to him because Mr. Shields confirmed Petitioner's story that he "was not an active participant, [and that] he did not agree to the actions of Ms. Brinson." Petition at 5. Thus, trial counsel's decision not to impeach Mr. Shields was a strategic one subject to deference. Indeed, in closing argument, defense counsel said, "The testimonial evidence from Kevin Shields and from [Petitioner] were consistent." Doc. 8-20 at 59.

Finally, even if Mr. Shields had been impeached, without his trial testimony, the record provides strong support for a second-degree murder conviction, as discussed at length previously. Accordingly, because Petitioner fails to overcome AEDPA's deferential standard and fails to show any alleged deficient performance by his trial counsel prejudiced his defense, Petitioner is not entitled to relief on ground four.

### E. Ground Five

In ground five, Petitioner asserts the cumulative effect of his counsel's errors "produced a fundamentally flawed trial." Petition at 16; Memo at 21. Petitioner raised this claim in his Rule 3.850 Motion. Doc. 1-1 at 50. The postconviction court ruled Petitioner's cumulative error claim was "without merit as a matter

of law" because "none of [Petitioner's] claims [were] legally sufficient." Id. at 12. The Fifth DCA affirmed without opinion. Doc. 8-31 at 55. Petitioner is unable to establish the state court's adjudication of the claim was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

Nevertheless, in the event the state court's adjudication is not entitled to deference, this claim is without merit. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted).

The Eleventh Circuit addresses cumulative error claims "by first considering the validity of each claim individually, and then examining any errors that [it] find[s] in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). Because the Court has determined that none of Petitioner's individual claims of error or prejudice have merit, Petitioner's cumulative error claim cannot stand. As discussed, the evidence more than supports a

second-degree murder conviction even without the alleged errors by trial counsel. Thus, Petitioner is not entitled to relief on ground five.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED.**

2.    This action is **DISMISSED WITH PREJUDICE.**

3.    The **Clerk** shall enter judgment accordingly and close this case.

4.    If Petitioner appeals the denial of his Petition, **the Court denies a certificate of appealability.**[20] The **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

---

[20] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, this Court will deny a certificate of appealability.

**DONE AND ORDERED** at Jacksonville, Florida, this 15th day of June 2020.

BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record